LEE EDNA FORD AND JOHN R. FORD, ET AL [1], Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Ford v. Commissioner
Docket Nos. 1224-70, 1658-70, 4673-71, 4994-71, 5037-71, 5079-71, 3430-72, 3798-72, 4653-72, 5224-72, 7555-72, 8988-72, 3851-74, 4448-74, 5539-74, 7202-75, 5683-76, 5361-77, 6248-77, 7425-77, 6252-78, 7978-79. (Ventura Properties Issues)
United States Tax Court
T.C. Memo 1986-104; 1986 Tax Ct. Memo LEXIS 501; 51 T.C.M. (CCH) 608; T.C.M. (RIA) 86104; March 18, 1986. Jed Gladstein, for the petitioners. M. Catherine McKenna and David L. Denier, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: These consolidated cases were assigned for trial or other disposition to Special Trial Judge Fred R. Tansill pursuant to section 7456(c) and Rule 180, et seq. [2] The Court agrees with and adopts *502 the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE TANSILL, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax for the years and in the amounts as follows: Docket
Additions to Tax
Petitioners
Number
Years
Deficiency
Sec. 6653(a)
Sec. 6651(a)
Lee Edna Ford
1224-70
1965
$5,097
and John R. Ford
1966
3,305
5037-71
1967
27,678
1,384
1968
32,970
1,647
5539-74
1970
6,023
301
1971
32,646
1,632
John R. Ford
7425-77
1973
156,337
7,816
$15,634
and Ida W. Ford
Morton Chesney and
8988-72
1969
542
Tilly Chesney
Harry J. Cohen
3430-72
1968
4,039
202
and Leah Cohen
7555-72
1969
8,732
437
4448-74
1970
4,293
215
1971
2,363
118
5683-76
1972
133,623
6,681
5361-77
1973
14,155
708
6252-78
1974
1,949
97
7978-79
1975
2,477
Michael M. Gurdin and
1658-70
1965
15,069
Marlene J. Gurdin
1966
10,981
4673-71
1967
15,711
785
1968
34,486
1,725
4658-72
1969
48,060
2,403
3851-74
1970
23,305
1,165
1971
52,421
2,621
7202-75
1972
38,157
1,908
6248-77
1973
425,522
21,276
Isaac L. Jones and
5224-72
1966
2,615
Isaac L. Jones as
1968
200,233
10,035
15,584
Administrator of
1969
200,023
10,001
the Estate of
Inger Stevens Jones
(Deceased)
Harold M. Plant
4994-71
1967
78,318
3,916
and Jean B. Plant
3798-72
1968
14,428
721
1969
43,516
2,176
Jack Tenner and
5079-71
1967
4,015
201
Hallie Tenner
1968
6,174
309
1969
6,413
322
*503 The primary issue for decision in this consolidated case is whether each of petitioners is entitled to deduct his distributive share of purported losses from the Ventura Properties Partnership for the tax years 1966 through 1973. [3] The reported partnership losses in each of the years in question resulted from a claimed interest deduction for interest paid to World Minerals, N.V. in each year, which respondent has disallowed entirely to the partnership. The other issues relate only to petitioners Cohen. [4] These other issues involve whether petitioners Cohen are entitled to deduct interest claimed to have been paid on purported personal loans from Anglo-Dutch *504 Capital Company, Antigua Banking Limited and Associated Convalescent Enterprises for the tax years 1970 through 1975. The Cohen group of cases at docket Nos. 3430-72, 7555-72, 4448-74, 5683-76 and 6252-78 had been consolidated and were originally tried by Judge William H. Quealy in 1979. Judge Quealy retired from the Tax Court before the filing of any briefs and before an opinion had been rendered and any findings of fact had been made. By this Court's order of December 17, 1980, a series of docket numbers was reassigned to Special Trial Judge Fred R. Tansill "for trial or other disposition" involving, inter alia, the docket numbers relating to the Ventura Properties Partnership and including the above noted Cohen docket numbers. By order, dated January 15, 1982, docket No. 7978-79 was added to the above consolidated group of docket numbers. The Cohens then moved for and were granted a new trial de novo. By order of February 5, 1982, the primary issue, whether each of petitioners is entitled to deduct his distributive share of purported losses from *505 the Ventura Properties Partnership (hereinafter referred to as the "Ventura Properties Issue") was severed in all docket numbers and those severed issues in all docket numbers, including the Cohen group of docket numbers relating to the Ventura Properties Issue, and the other Cohen issues, were then consolidated in this case for trial. PRELIMINARY MATTERS Collateral Estoppel
Petitioners argue on brief and in their amended petitions [5] that determinative issues in this case already have been litigated in previous cases in this Court and that, pursuant to the doctrine of collateral estoppel, respondent should be precluded from raising those same issues in this case. Petitioners cite the opinions in the following cases as precluding respondent from raising the substance versus form argument in this case: , , , , and Anglo Dutch Capital Company v. Commissioner, Docket Nos. 6105-71, 4129-72, 3343-74, 9376-74, 10488-75, 7845-78, 311-79. *506 In the recent case of , we stated that "[t]he doctrine of collateral estoppel precludes relitigation of any issue of fact or law that is actually litigated and necessarily determined by a valid and final judgment." The doctrine, however, "must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged." . The facts and issues with which we are concerned in this case are whether petitioners are entitled to their distributive share of purported losses from the Ventura Properties Partnership and whether petitioners are entitled to deduct interest payments to Anglo Dutch Capital Company, Antiqua Banking Limited, and Associated Convalescent Enterprises. None of these issues were actually litigated and necessarily determined in the cases cited by petitioners. Hence, respondent is not *507 collaterally estopped from raising these issues in this case. In their brief, petitioners argue that the modifications made by , and, , to the doctrine of collateral estoppel permit the application of collateral estoppel in the present case. We agree with petitioners that those cases allow the offensive use of collateral estoppel in certain circumstances and abandon the strict application of the doctrine of the mutuality of parties. We have, however, found that the facts and issues to be determined in the present case have not been litigated and previously determined in any of the cases cited by petitioners. Neither Parklane nor Blonder-Tongue would require or allow the use of collateral estoppel under these conditions. FINDINGS OF FACT Certain facts have been stipulated and are so found. The stipulations of facts and attached exhibits are incorporated herein by this reference. [6]
*508 Each of the petitioners at the time of filing their petitions in this case resided in California. (Ventura Properties Partnership)[7]
Harry Margolis (sometimes hereinafter referred to as "Harry") is an attorney in California who specializes in tax planning. He represented most of the petitioners, herein, advising them on various tax matters and provided the tax planning involved in this transaction. Ben Margolis (sometimes hereinafter referred to as "Ben") is Harry's brother. He, like Harry, is an attorney in California. John McTernan (sometimes hereinafter referred to as "McTernan") is also an attorney in California and was Ben's partner in the practice of law. Simon Lazarus (sometimes hereinafter referred to as "Lazarus") is a businessman in California. He has had a background in the real estate business and was a client of Ben and Harry. Harry did much of his tax planning through the use of foreign trusts located in tax haven jurisdictions. Harry's tax planning typically involved the establishment of a trust in a tax haven jurisdiction *509 in order to avoid the payment of United States tax on income received by the trust. Harry, Ben, McTernan, Lazarus and most of the petitioners herein were all settlors or beneficiaries of foreign trusts established by Harry. [8]
Harry routinely employed a number of foreign and domestic entities to effectuate his tax planning. These entities were commonly referred to as "system entities" by those in Harry's office. These system entities formed an extensive "system" the activities of which were directed and controlled by Harry. Most of the domestic entities were directly owned and controlled by Harry. Anglo-Dutch Capital Company (hereinafter referred to as "Anglo-Dutch"), a company pertinent to the transaction in this case, was a California company owned during most of the period relevant herein, 50 percent by Harry and 50 percent by Walter Joe, a CPA and employee of Harry. Harry became the 100 percent owner of Anglo-Dutch when he purchased all of Mr. Joe's stock sometime in 1971 or 1972. Anglo-Dutch was a finance company involved in the business of loaning money. It catered *510 almost exclusively to clients and associates of Harry. Harry had loan approval authority during the entire period herein involved. The books and records of Anglo-Dutch were kept by Harry's office. A. G. Smeets was a notary of Curacao, Netherlands Antilles. Many of the foreign entities used by Harry were owned and/or controlled by the Smeets organization (hereinafter referred to as "Smeets"). Harry visited Smeets in Curacao many times in his tax planning endeavors. Dr. Alvares Corea (hereinafter referred to as Dr. Corea) was business manager and chief counsel for Smeets until approximately 1967. Everd van Walsum (hereinafter referred to as "van Walsum") an employee of Smeets, became the managing director for Smeets after Dr. Corea left. Aruba Bonaire Curacao Trust Company Limited (hereinafter referred to as "ABC") was a licensed trust company created as a Bahamian corporation and operated in the City of Nassau, Bahamas. ABC was owned of record by Koningsplein, N.V., a Netherlands Antilles Corporation (hereinafter referred to as "Koningsplein"). Koningsplein was controlled by Smeets and owned of record by Dr. Corea. ABC was established in 1962 at the suggestion of Harry. *511 Harry informed Dr. Corea that if he would incorporate ABC to act as a corporate trustee, he would transfer all the trusts he had previously established to the account of ABC. Thereafter, ABC was formed and the trusts established by Harry were transferred to ABC's account. ABC acted as trustee for the trusts established by Harry during the relevant period herein involved. Most of the petitioners had interests in trusts where ABC acted as trustee. [9] All books and records of ABC were kept in Smeets's office overseas and were not made public. The Greater West Company (hereinafter referred to as "Greater West") was a California Corporation all of whose stock was owned by ABC. Greater West was liquidated into ABC, its parent, sometime in late 1966 or early 1967. El Rio Development Company (hereinafter referred to as "El Rio") was a California Corporation all of whose stock also was owned by ABC. Harry was a member of the Board of Directors of El Rio. Sometime after 1969 or 1970 all the affairs of El Rio were managed and handled by Harry's office. Greater West and El Rio were often used by ABC to take title to real estate in the United States. The domestic *512 books and records of Greater West and El Rio were kept by Harry's office. World Minerals N.V. (hereinafter referred to as "World Minerals") is a Netherlands Antilles Corporation. World Minerals was controlled by Smeets, and owned by Koningsplein. Van Walsum was president of World Minerals at the time of the transactions in question. The books and records of World Minerals were kept in Smeets's office overseas and were not made public. World Minerals was used almost exclusively by ABC for loaning money. Anglo-Dutch's source of funds was generally World Minerals. Although these entities were on record owned or controlled by Smeets, Harry exercised effective transactional control over these entities when they were involved in his tax planning transactions. Harry would typically send memos, commonly referred to as "planning memos," to Smeets indicating that various actions should be taken with respect to ABC, World Minerals, Greater West of El Rio. His planning memos often instructed Smeets to draft letters including such detail as what paper should be used, the letterhead on the paper, who was to sign the letter and where the letter was to be sent. Harry usually received *513 his legal fee based on a percentage of tax be saved his clients. His legal fees were usually computed on the basis of 1/3 of the tax savings received by a client pursuant to Harry's tax planning, less actual cost of the planning. The property located at 16125 Ventura Boulevard, Los Angeles, California (hereinafter referred to as the "Ventura Property"), which is the subject matter of the primary transaction involved herein, consists of a frontage of 265.58 feet and a depth of 500.15 feet. The only improvement on the Ventura Property throughout the years involved was a simple, one-story frame building rented to a flower shop business. Ben, Harry and McTernan became acquainted with the Ventura Property through Lazarus. Lazarus had seen the property and had begun negotiations for the purchase of the property for $710,000. All four of these individuals felt certain the property was a good buy and they agreed to purchase the property together. Harry, as a tax practitioner, naturally became responsible for structuring the transaction from a tax perspective. Harry recommended that he, Ben, McTernan and Lazarus (sometimes hereinafter referred to as the "Trust Investors") forgo the *514 potential tax benefits of direct ownership of the Ventura Property in the United States and instead take ownership of the property through their foreign trusts. Taking ownership of the property through their foreign trusts would allow them to avoid the requisite capital gain holding period, in the event of a quick turn around sale, and payment of tax due on any gain realized from the sale of the property. Further, Harry indicated that taking ownership of the Ventura Property through their foreign trusts would provide flexibility for further tax planning. The Trust Investors believed that the property would appreciate substantially. At one point they intended to secure a loan to pay off any underlying debts they would have to assume or, in the alternative, syndicate the property and take their money out. An undated memorandum from Ben to his files provides as follows: We have decided today to go ahead with the purchase of the land on the present basis, subject however to the following modifications * * *. 4. Lazarus is to try to arrange a $350,000.00 loan at 7 1/2%, three points and subject to a penalty of 7% if it is paid off before five years and a decreasing penalty as *515 time goes on. If he does not succeed, we are to look elsewhere for a loan. 5. If we get the loan, this will mean that we will have to make payments of approximately $3,100.00 a month on the $350,000.00 loan plus about $400.00 a month on taxes or a total of about $3,500.00 a month. But the $350,000.00 loan will repay us our initial investments, pay off the $50,000.00 and $150,000.00 Notes so that there are no further monthly payments and pay the bigger part of the $50,000.00 payment due on January 1st, 1967, on the remaining Note. In other words, aside from the aforementioned $3,500.00 a month, there will be no investment except the $3,500.00 a month mentioned above and approximately $15,000.00 to $20,000.00, the balance necessary to make up the $50,000.00 payment on January 1, 1967. There will be no other payments besides the continuing $3,500.00 monthly payments until January 1, 1969. If we cannot sell the property before that time, and we so desire, we will then syndicate the entire venture, something which Harry believes he can easily do, so that we will at least get out of it whole, even though under those circumstances we may make no profit. 6. If we are unable to get *516 the loan within the next several months, then we will syndicate the whole deal immediately, reserving to ourselves a share of the profits for putting the deal together and participating in the syndicate to the extent that each of us desires to do so. 7. In short, if we do get the loan, we will be able to carry the matter for approximately four years putting in approximately the amount which we have planned to initially invest but putting it in over that period of time if we get the loan. On the other hand, if we do not get the loan, we will equally avoid getting into over-extended situation by syndicating the proposition and reserving some small part of the profits for ourselves and participating in the syndicate to the extent that it does not create financial problems for any of us. Ben participated in the final negotiations for the purchase of the Ventura Property which resulted in a final purchase price of $700,000. At the actual consummation of the sale on April 21, 1966, Ben represented the Trust Investors; however, all aspects related to the financing and the structuring of the transaction were the responsibility of Harry. In a memo, dated March 11, 1966, to Ben, Harry *517 provided the following. 1. The entire transaction will be handled through El Rio Development Company and there will be a number of technical problems in this connection that are primarily my responsibility. The ultimate benefit from the project will accrue 50% to the Lazarus Trust, 15 5/8% to the McTernan Trust, and 34 3/8 to the Margolis Trust. The Margolis Trust will independently show 15 5/8% for Ben Margolis and 18 3/4% for Harry Margolis. 2. Using $170,000.00 as the round figure cash needs at this time, would show $85,000.00 due from Lazarus, $26,000.00 each from you and John, and $32,000.00 from me. It is my understanding that each of the parties will, in fact, be responsible for and put up the share of the money as required though the technical manner will be left for me to work out in the next few days. The Trust Investors purchased the Ventura Property from Marvin Wilson and Samuel Gilbert on April 21, 1966 for $700,000. Marvin Wilson and Samuel Gilbert had become the record and beneficial owners of the Ventura Property on December 29, 1965 by purchasing the property from Carlotto Ltd., a limited partnership. Wilson and Gilbert had paid $650,000 for the property *518 payable as follows: (1) Assumption of a deed of trust in favor of Investors Savings & Loan, balance due of $149,929.73 at 7% interest, principal and interest payable at $1,483.10 per month. (2) Assumption of a deed of trust in favor of Morrison Marital Trust, balance due of $54,163.13 at 10% interest, principal and interest payable at $1,000.00 per month. (3) A new third deed of trust in favor of Carlotto, Ltd., in the amount of $445,847.14 at 6% interest, interest payable annually beginning January 1, 1969 with a principal payment due December 31, 1966 in the amount of $50,000.00. The balance of the note plus any interest accrued was due and payable in full on or before January 1, 1971. Having agreed to take ownership through their foreign trusts, El Rio, on behalf of ABC as trustee for the trusts, became record owner [10] of the Ventura Property. Throughout the term of the transaction here in question, record title remained in the name of El Rio until 1973, when record title was conveyed to a third party, Encino Financial Ltd., pursuant to a sale for $690,000. *519 On April 21, 1966, the date of acquisition of the Ventura Property by El Rio, the following deeds of trust, which were assumed by El Rio, were recorded as encumbrances on the Ventura Property: Deed Of Trust In Favor Of
Balance
1.) Investors Savings & Loan Association
$148,497.94
2.) Morrison Marital Trust
54,163,13
3.) Carlotto, Ltd., a limited partnership
445,847.14
Payment
Expiration
Int. Rate
Required Payment
Amount
of Term
1.) 7%
Principal & Interest Monthly
$1,483.10
Until paid
2.) 10%
Principal & Interest Monthly
1,000.00
Until paid
3.) 6%
Principal only
50,000.00
Due 12/31/66
(Interest only - Annually
until 1/1/71).
On the acquisition of the Ventura Property, El Rio caused to be deposited into escrow the sum of $156,575.76. On the close of escrow, $100,000.00 was paid to Carlotto, Ltd., reducing the principal amount of the above debt by the same amount. El Rio contractually agreed with the sellers to assume the above encumbrances, although no consent to their assignment was given by the holders of the respective deeds of trusts. The remaining $56,575.76 was disbursed from escrow representing the sellers' *520 equity and the normal escrow fees, costs and apportionments. The deed from Marvin Wilson and Samuel Gilbert to El Rio is dated April 21, 1966 and was recorded with the Los Angeles CountyRecorder on April 25, 1966. A title insurance policy on the Ventura Property was issued on behalf of El Rio as of April 25, 1966. Although the Trust Investors had already purchased the Ventura Property, they continued to negotiate the ownership interest each would take in the property. In a letter from Ben to Lazarus on April 27, 1966 the final ownership terms of the purchase were provided as follows: 1. The total investment as of the present time is $156,792.05. Of this you are taking one-third (1/3), John and I are taking one-third (1/3), and Harry Margolis, together with a client of his, is taking the last one-third (1/3). The one-third investment amounts to $52,264.02. 2. To date all of the money has been advanced through North American. You and John and I will receive instructions shortly with respect to the payments of our shares. It is understood that you may limit your payment, if you desire, to $50,000 at this time with the balance to be adjusted later. If you decide to so *521 limit it, we will discuss at our conference on May 7 how the balance shall be handled. Prior to the Ventura Property purchase, ABC did not seek an independent appraisal of the Ventura Property. ABC and El Rio acted strictly according to Harry's orders. After the purchase, Lazarus acted as agent for the Trust Investors, collected rents from the single tenant and paid bills. He continued this activity until January of 1968. The real estate market in California in the mid-1960s began to slump and at one point became listless. In addition to the badly depressed real estate market, the money market tightened and interest rates rose. Money for development became scarce. In December of 1966, some eight months after the Trust Investors had purchased the Ventura Property, Ventura Properties Partnership (hereinafter referred to as the "Partnership") was purportedly formed pursuant to a document titled "Ventura Properties Partnership: Partnership Agreement" (hereinafter referred to as the "Partnership Agreement") prepared in the law offices of Harry. The Partnership Agreement was signed at some time by or on behalf of petitioners. [11] The Partnership was formed to acquire the Ventura *522 Property. The Partnership Agreement in pertinent part provides as follows: This partnership agreement is entered into and effective this 1st day of December, 1966, by and between the partners as follows: Name
Address
Harry J. Cohen
740 Foothill Drive, San Mateo, Ca. 94402
Elaine B. Fischel
5222 West 67th Street, Los Angeles, Ca.
Albert Aronow
3804 Evans Street, Los Angeles, Ca.
Milton Rosenthal, M.D.
9803 Venice Blvd., Culver City, Ca.
Michael Gurdin, M.D.
9021 Sunset Blvd., Los Angeles, Ca. 90069
Eugene Carlin, M.D.
9201 Sunset Blvd., Los Angeles, Ca. 90069
Harold M. Plant
10000 Santa Monica Blvd., Los Angeles,
Ca. 90067
Inger Stevens
8000 Woodrow Wilson Dr., Los Angeles, Ca.
90046
John Ford, M.D.
1518 Republic Street, San Diego, Ca.
92114
Morton Chesney
1815 Spruce Street, Berkeley, California
John R. Suckling
17013 Bollinger Drive, Pacific Palsades,
Ca.
Jack Tenner
6399 Wilshire Blvd., Los Angeles, Ca.
90048
Clayton E. Brock, M.D.
16161 Bachman Ave., Monte Sereno, Ca.
95030
Horst D. Weinberg, M.D.
1523 West Robinwood, Fresno, Ca.
hereinafter sometimes referred to as partners, all of whom desire to form a partnership *523 pursuant to the provisions of the California law covering partnerships and specifically that portion known as the Uniform Partnership Act. The parties hereto have on this day agreed to, and by these presents do, enter into and form a partnership on the terms, covenants, and conditions hereinafter set forth. NOW, THEREFORE, it is mutually agreed by and between the parties hereto as follows: I NAME OF PARTNERSHIP The name of this partnership shall be VENTURA PROPERTIES PARTNERSHIP (hereinafter referred to as the "Partnership"). II CERTIFICATE OF PARTNERSHIP The parties shall, whenever necessary, sign and acknowledge a certificate of partnership and shall thereafter cause said certificate to be filed in the Clerk's Office with another copy being filed in the Office of the Recorder of Los Angeles County. If, at any time, the partnership has places of business which are situated in different counties, a copy of the certificate, certified by the Recorder in whose office it is recorded, shall be filed in the Clerk's Office and Recorded in the Office of the Recorder in each such county. * * * IV GENERAL PARTNERS MAY ALSO BE LIMITED PARTNERS The general partners are hereby *524 permitted to also be limited partners. As to any general partners who are also limited partners, their rights and liabilities in each category shall not be affected by their rights and liabilities in the other category. V CHARACTER OF BUSINESS OF PARTNERSHIP The purpose of this partnership is to engage in the acquisition, holding, maintenance, improvement, management, lease, and exchange of that certain real property known and described as follows: That portion of Lot 2 in Block 24 Tract No. 2955, in the City of Los Angeles, County of Los Angeles, State of California, as per map recorded in Book 31, Page 62 of Maps, in the Office of the County Recorder of said county, lying south of a line extending from a point in the east line of Lot 7, of said Block, distant north thereon 20.63 feet from the northeast corner of Lot 1 of said Block, southwest to a point in the west line of said Lot 2, distant south 80" from an angle point in the South 80' from an angle point in the south line of the land described in the deed of H. R. Balcom, recorded in Book 792, Page 144, Official Records. EXCEPT therefrom that portion lying northerly of the following described line: Beginning at the *525 intersection of the easterly prolongation of the northerly line of Moorpark Street, 54.00 feet wide, as shown on map of Tract No. 16227, recorded in Book 430, Page 2 and 3 of Maps, in the Office of the County Recorder of said county, with the westerly line of said Lot 2; then easterly along said prolongation to the easterly line of said Lot 2, and any other business related to: provided that the sale of real property acquired by the partnership shall not be deemed to be part of the business of this partnership and any such sale shall be deemed to be an act which is in contravention of this agreement which requires the specific consent or ratification of all limited partners within the meaning of Section 15009 (1) (a) of the Corporation Code of the State of California, and the giving of such consent by a limited partner shall not be deemed to be taking part in the control of the business of this partnership but rather shall be deemed to be the exercise of a power upon a matter affecting the basic structure of the partnership within the meaning of Section 15507 (b) of said Corporations Code. The specification of particular business shall not be deemed to be a limitation upon the *526 general powers of the partnership. VI PRINCIPAL PLACE OF BUSINESS The principal place of business of the partnership shall be in Los Angeles, California, or at such other place or places as the partners shall hereafter determine. VII DESIGNATION OF PARTNERS AND THEIR RESPECTIVE CAPITAL CONTRIBUTIONS The following persons shall be managing partners: Name
Address
Benjamin Margolis
3175 West Sixth Street, Los Angeles, Ca.
90005
John T. McTernan
3175 West Sixth Street, Los Angeles, Ca.
90005
The managing partners shall make no contributions in cash or property to the capital of the partnership. Their contribution shall be the devotion of their time, service, energy, and business experience and expertise to the business of the parthership. They shall share in ten cent of the profits but none of the losses. VIII DESIGNATION OF NON-MANAGING PARTNERS AND THEIR RESPECTIVE CAPITAL CONTRIBUTIONS The initial capital contribution of each partner shall consist of the amounts in cash contributed prior to 12/31/66 by each partner. The capital interest of each partner shall consist of the capital invested as of the end of each calendar year. Each partner's *527 capital contribution shall be fully paid on or before December 31st each year as from time to time agreed among them. The receipt of the capital contributions of each of the partners shall be acknowledged by the managing partners and reflected in its records. IX ADDITIONAL CAPITAL CONTRIBUTIONS No partner, general or limited, shall be held to have agreed to contribute as capital any additional cash or property beyond that of each current year. * * * XI PROFIT AND LOSS SHARING BETWEEN PARTNERS The profits and losses of the partnership shall be divided between the partners in the following proportions: a. Losses of the partnership shall be divided equally among the partners as a group, excluding only the managing partners. b. Profits of the partnership shall first be applied so as to pay to the managing partners ten per cent (10%) thereof. The balance shall be first paid to the partners making contributions, a sum equal to eight percentum (8%) per annum on the capital contribution on each partner. c. The profits of the partnership shall next be applied so as to repay to each partner a sum equal to the total sum paid to the partnership *528 by such partner. d. Any remainingprofits of the partnership shall be dividedequally among the partners as a group, including the managing partners. e. Profits paid to the managing partners shall be divided one half (1/2) to BENJAMIN MARGOLIS and one half (1/2) to JOHN T. MCTERNAN. f. The division of profits and losses shall be made at the close of each accounting period as determined by the partnership. g. Not withstanding any other provision of this agreement, no partner shall become liable upon the obligations of the partnership which are in excess of his capital contributions as set forth in this agreement. * * * XIX PARTNERSHIP DURATION The partnership shall commence as of the date the property was acquired and shall continue for an indefinite period of time. *529 All petitioners in this case were named partners in the Partnership. The Partnership Agreement names no general partners but names Ben and McTernan as managing partners. The Partnership Agreement provides the managing partners will make no capital contributions but will be entitled to share in 10 percent of the Partnership's profits. Harry and Lazarus were not listed as partners. The Partnership, Greater West [12] and El Rio purportedly entered into an agreement for sale of the Ventura Property dated November 1, 1966 (hereinafter referred to as the "Sale Agreement"). The Sale Agreement was signed by all parties and provides in pertinent part as follows: WHEREAS, EL RIO holds title to certain property located on Ventura Boulevard in the County of Los Angeles, the exact definition of which is annexed hereto and designated Exhibit "A" and incorporated herein by this reference; and, WHEREAS, GREATER WEST desires to dispose of its interest in said property; and, WHEREAS, EL RIO has purchased the subject property as an accommodation to all parties and for other consideration specified below; and, WHEREAS, VENTURA desires to purchase said property. NOW, THEREFORE, in consideration *530 of the mutual promises of the parties hereto it is hereby agreed: 1. All parties acknowledge that GREATER WEST is the true beneficial owner of the subject property and that as an accommodation to all parties EL RIO holds title for the account of GREATER WEST. 2. The parties hereto owe no obligation to EL RIO except as expressly set forth herein. 3. EL RIO will continue to hold title for the sole benefit of VENTURA. VENTURA shall not be required to pay EL RIO anything for such holding of title and EL RIO will, on request of VENTURA, deliver title to VENTURA provided only that EL RIO shall be required to give GREATER WEST thirty (30) days written notice of such intent to transfer title. * * * 6. GREATER WEST acknowledges receipt from VENTURA of Ten Thousand Dollars ($10,000.00) to be applied to interest due hereunder for the period ending December 31, 1966. 7. VENTURA shall purchase all the real property which is the subject of this Agreement from GREATER WEST effective this date for the sum of One Million Five Hundred Thousand Dollars ($1,500,000.00). No down payment shall be required and no payment of principal shall be made until October 31, 1972, on which date *531 all principal and unpaid interest shall be due and payable. Interest shall accrue on the unpaid balance of principal at the rate of ten percent (10%) per annum, provided that VENTURA shall be entitled to a reduction in the interest rate for prepayment of interest as follows: (a) Interest shall be deemed to accrue at the rate of four and one half percent (4 1/2%) per annum of all the interest for the entire six year period on the entire principal amount is paid in full, computed at such rate, on or before December 31, 1968, provided further that at least Two Hundred Thousand Dollars ($200,000.00) of interest shall have been paid by December 31, 1966. (b) Interest shall be deemed to accrue at the rate of five and three quarters percent (5 3/4%) per annum if all of the interest for the entire six year period on the entire principal amount is paid in full, computed at such rate, on or before December 31, 1969, provided further that at least Two Hundred Thousand Dollars ($200,000.00) of interest shall have been paid by December 31, 1966 and additional interest in the amount of at least Two Hundred Thousand Dollars ($200,000.00) shall have been paid by December 31, 1968. * * * *532 9. Except as hereinafter expressly provided VENTURA agrees not to alienate or encumber the subject property without the express consent of GREATER WEST. The parties acknowledge, however, that World Minerals N.V., a Netherlands Antilles corporation, is prepared to finance improvements on the property to the maximum extent of Six Million Dollars ($6,000,000.00), and it is expressly agreed that VENTURA shall have the right to place any encumbrance on the property required by World Minerals in accordance with such financing by World Minerals provided only that at such time World Minerals shall guarantee the obligation of VENTURA to GREATER WEST hereunder. Otherwise, VENTURA shall have the right to acquire title to the property and encumber same for the purpose of acquiring a construction loan to commence improvement of the property provided only that the ratio of borrowing for purposes of construction shall produce a finished improvement that will involve an investment of no less than Three Million Dollars ($3,000,000.00). Such Three Million Dollars ($3,000,000.00) investment must be borrowed at an interest rate no greater than six and one-quarter percent (6 1/4%) per annum and for *533 no period less than twenty-five (25) years and the operating statement for the finished project shall show a triple net return of eight percent (8%) of the total capital on the project and further that bona fide leases shall exist for no less than seventy percent (70%) of the space in the finished commercial units for a period not less than ten (10) years. GREATER WEST shall have ninety (90) days written notice of the improvements desired to be placed upon the property by VENTURA so that it may suitably examine the proposed improvements. Thus, according to the terms of the Sale Agreement, the Partnership acquired the Ventura Property for $1,500,000, with no down payment or payment of principal due until October of 1972, approximately fix years later. The Sale Agreement did however, require the payment of at least $200,000 in prepaid interest by December 31, 1966 and an additional $200,000 in prepaid interest by December 31, 1968 in Order to reduce the interest rate charge, provided, that all interest due was paid by December 31, 1969. No promissory note evidencing the $1,500,000 debt was ever executed by the parties to this transaction. In 1971, an I.R. *534 S. appraiser report, appraising the Ventura Property as of November, 1966, valued the Ventura Property at $700,000. Somewhat contemporaneous to the time the Partnership was purportedly formed, a Letter Agreement (hereinafter referred to as the "Letter Agreement") dated November 30, 1966, addressed to the Partnership by World Minerals as of that date, was signed by the Partnership in December of 1966. The Letter Agreement provides in part as follows: Your continued interest in World Minerals, N.V. is deeply appreciated. We do not have sufficient funds available at this time to finance a project of the size that is contemplated.However, if it is acceptable to Ventura Properties Partnership we would be definitely interested in entering into an agreement at this time that would give us the right to finance the project when funds are available. We would like to have the exclusive right to finance the development of the project and also have an option to purchase the property from you at your cost in the event that for any reason the development does not take place. Accordingly, it is proposed that Ventura Properties Partnership agree to look solely to World Minerals N.V. as lender *535 on the project; that World Minerals N.V. have the option to purchase the property from Ventura Properties Partnership at the expiration of two years from the date hereof for a total price of One Million Five Hundred Thousand Dollars (1,500,000) if construction has not begun on the property by such date; that in consideration for the foregoing World Minerals will guarantee to Ventura Properties Partnership that the property will be sold by World Minerals N.V. for the account of Ventura Properties Partnership on or before October 31, 1972, for no less than One Million Five Hundred Thousand Dollars ($1,500,000) net except that Ventura shall have the absolute right to accept or reject any such offer when it is obtained by World Minerals N.V. for Ventura Properties Partnership, and World Minerals N.V. will further guarantee to Ventura Properties Partnership that the gross income to Ventura Properties Partnership from the property hereunder will not be less than Ten Thousand Dollars ($10,000) for the period from November 1, 1966 to and including October 31, 1967, and will not be less than Fifteen Thousand Dollars ($15,000) for the second twelve-month such period and not less than Twenty *536 Thousand Dollars ($20,000) for the third twelve-month such period and not less than Twenty Thousand Dollars ($20,000) for each succeeding twelve-month period with this guaranty expiring on October 31, 1972. Essentially, this Letter Agreement provided World Minerals with the exclusive right to finance any future development of the Ventura Property together with an option to purchase the Ventura Property for $1,500,000. In exchange for the exclusive right to finance any future development, World Minerals guaranteed to sell the Ventura Property for the Partnership for no less than $1,500,000, the Partnership's cost. Throughout the term of its existence, in order to pay its expenses, the Partnership borrowed money from Anglo-Dutch, a corporation, and Professional Properties Partnership (hereinafter referred to as "PPP"), a partnership formed by and for clients of Harry to acquire a shopping center. Like Anglo-Dutch, PPP was a system entity controlled by Harry. Further, with few exceptions, the funds for contributions made by the partners to the Partnership were received as loans to the partners from Anglo-Dutch and other system entities. These loans were processed by Harry's office *537 and often times employees of Harry signed notes on behalf of the Partnership even through they had no signing authority nor were they partners. On occasion, Harry himself signed notes on behalf of the Partnership. Throughout the existence of the Partnership, Harry, Ben, Lazarus, McTernan and the petitioners met to discuss the progress of the Ventura Property. Harry would arrange the time and place of the meetings and Lazarus and Ben would report on any progress. During the period of April 1966 through January 1968, payments of the obligations on the underlying deeds of trust assumed by El Rio were not paid by the Partnership, but were paid by Lazarus from funds received from Harry. A bank account in El Rio's name had been established and Lazarus paid the expenses of the Ventura Property, including taxes and the underlying deeds of trust mentioned above from that account. If the El Rio bank account lacked sufficient funds to cover necessary expenses, Lazarus would contract Harry who, through his office, would send money to pay these expenses. No formal partnership records existed during this period (April, 1966 through January, 1968). The only records of amounts paid were some *538 handwritten notes kept by Lazarus. Beginning on February 9, 1968, and continuing through December 14, 1972, Partnership books and records reflect payments on the obligations incurred by El Rio's assumption of the deeds of trust for the Ventura Property. The Partnership books and records also reflect payments to World Minerals, Anglo-Dutch and PPP. For the taxable years 1966 through 1973, the Partnership reported the following amounts as interest expenses on its Federal income tax returns: Year
Amount of Interest Expense
1966
$195,000
1967
17,190
1968
100,790
1969
217,670
1970
17,999
1971
69,545
1972
16,921
1973
Of the amounts reported by the Partnership as interest expense on its Federal income tax returns for the taxable years 1966 through 1973, the following amounts were purportedly paid to World Minerals, Anglo-Dutch, PPP and the holders of the underlying deeds of trust which were assumed by El Rio (referred to as the "Underlyings"): World Minerals
ADC
PPP
Underlyings
Total
1966
$195,000
$195,000
1967
17,190
17,190
1968
100,790
100,790
1969
217,670
217,670
1970
17,999
17,999
1971
31,346
22,000
16,199
69,545
1972
16,921
16,921
1973
Total
$530,560
$31,346
$22,000
$51,119
$635,115
*539 In a letter dated November 12, 1969 and signed by van Walsum, World Minerals [13] offered to extend any amount owing on the $1,500,000 balance of the purchase price on the Ventura Property [14] and to waive any further interest due in exchange for a release from their obligation to finance any development and their obligation to sell the Ventura Property for the account of the Partnership. The letter provides in pertinent part: In consideration of your freeing us from our obligation to finance the property and from certain other obligations we are prepared to waive any further interest due or owing on the $1,500,000 balance and to further extend the due date for the payment of principal to January 1, 1975. We make this offer on the following terms and conditions: 1.We will be specifically relieved of any obligation, tentative or otherwise, to provide financing for the development of the Ventura Boulevard property. * * * 3. We will be relieved of any and all obligations relating to our guaranty that the property will be sold by World Minerals N.V. for the account of Ventura Properties Partnership on or before October 31, 1972, for no less that [sic] $1,500,000 net. 4. *540 You will undertake to make all required payments on the existing loans on the property effective January 1, 1970. This is intended primarily as a convenience to us and will be of no economic detriment to you since we will appropriately apply the amount of such outstanding loans as of January 1, 1970, against the balance due to us. The Partnership responded by letter dated November 26, 1969 agreeing to release World Minerals from its obligation to finance any development but refused to release World Minerals from its obligation to sell the Ventura Property for the account of the Partnership. Shortly thereafter, an agreement titled "Termination and Sale Agreement for Ventura *541 Properties Partnership" (hereinafter referred to as the "Termination Agreement") was signed by the Partnership, and certain of its partners, evidencing a buyout of those partners' interests. The selling partners involved in this buyout were Albert Aronow, Harold M. Plant, Morton Chesney, John R. Suckling, and Jack Tenner. The Termination Agreement provides in pertinent part as follows: The parties to this agreement are the partnership known as Ventura properties partnership, Albert Aronow, Harold M. Plant, Mortan Chesney, John R. Suckling, and Jack Tenner. The subject of this agreement relates to the interest of the individuals named in Ventura Properties Partnership, which commenced in the calendar year 1966. The purpose is to conclude the interest of the persons named in the partnership under the terms and conditions hereinafter set forth. * * * 3. The partnership is to pay Aronow $5,000, Plant $10,000, Chesney $5,000, Suckling $20,000, and Tenner $30,000 before the end of 1969 in full satisfaction and for the purchase of the total interest of each such party in and to the partnership in all respects. 4.Each of the parties is to make one final payment representing his *542 share of partnership operating costs through the end of 1969 in the sum of $2,500 for Aronow, $5,000 for Plant, $2,500 for Chesney, $10,000 Suckling and $15,000 for Tenner.This sum is to be nonreturnable. The Partnership Agreement was then amended by an agreement titled "Amended Partnership Agreement" (hereinafter referred to as "Amended Partnership Agreement") dated "March 1970". The Amended Partnership Agreement provides in pertinent part as follows: AGREEMENT made and entered into this     day of March, 1970 by and between the following, constituting all of the partners of VENTURA PROPERTIES PARTNERSHIP: Ben Margolis, 3325 Wilshire Boulevard, Los Angeles, California
John T. McTernan, 3325 Wilshire Boulevard, Los Angeles, California
Harry J. Cohen, 740 Foothill Drive, San Mateo, California
Elaine B. Fischel, 4055 Wilshire Boulevard, Los Angeles, California
Michael Gurdin, M.D., 9201 Sunset Boulevard, Los Angeles, California
Eugene Carlin, M.D., 9201 Sunset Boulevard, Los Angeles, California
Inger Stevens, 8000 Woodrow Wilson Drive, Los Angeles, California
John Ford, M.D., 1518 Republic Street, San Diego, California
Clayton E. Brock, 16161 Bachman Avenue, *543 Monte Sereno, California
Horst D. Weinberg, M.D., 1523 West Robinwood, Fresno, California
WHEREAS the parties have been partners in a partnership known as Ventura Properties Partnership formed December 1, 1966, pursuant to the provisions of the California Uniform Partnership Act, and WHEREAS several of the original partners have withdrawn from the partnership, and WHEREAS the requirement of capital contribution from the partners has proved to be higher than was originally anticipated at the time of the formation of the partnership, and WHEREAS the partnership was originally formed as a limited partnership such that the partners was required to contribute less capital than it is now known to be necessary for the maintenance of the business of the partnership, and WHEREAS the parties hereto now wish to make the necessary changes in the partnership agreement to comply with the partnership's need of capital, IT IS THEREFORE AGREED AS FOLLOWS: 1. The parties hereto reaffirm that they are partners in Ventura Properties Partnership, and hereby reaffirm all of the provisions of that certain Partnership Agreement of December 1, 1966, except as hereinafter expressly modified. *544 2. Effective January 1, 1970 this partnership shall be a general partnership as that term is defined under the California Uniform Partnership Act. 3. The above named Ben Margolis and John T. McTernan shall be the managing partners and shall exercise all of the rights and powers and enjoy all of the privileges and immunities of managing partners provided in the Partnership Agreement of December 1, 1966. The managing partners shall make no contributions in cash or property to the capital of the partnership. Their contribution shall be the devotion of their time, service, energy and business experience and expertise to the business of the partnership. They shall share in ten percent (10%) of the profits but none of the losses. 4. Each of the partners with the exception of the managing partners, shall contribute to the partnership, prior to December 31, 1970, in cash, an amount equal to that partner's negative capital as of December 31, 1969. The parties hereto acknowledge that their respective negative capital accounts as of December 31, 1969 were as follows: Harry J. Cohen
$11,198.95
Elaine B. Fischel
7,424.95
Michael Gurdin
7,482.95
Eugene Carlin
7,482.96
Inger Stevens
8,761.95
John Ford
14,852.96
Clayton E. Brock
14,852.95
Horst D. Weinberg
8,643.95
*545 5. In addition to the requirements of the foregoing paragraph, each partner shall contribute to the partnership, from time to time, as need requires, but at least annually, an amount equal to his then current negative capital account. No contribution of capital will be required of any partner at any time that his capital account shows a positive balance. Notwithstanding the foregoing sentence, the partners, with the exception of the managing partners, shall be jointly and severally liable for the debts of the partnership. The partners all hereby agree to save and hold the managing partners from and against any liability or claim arising against the managing partners, or either of them, by reason of their participation in this venture. 6. The losses of the partnership shall be divided among the partners in proportion to their capital accounts at the beginning of the years, excluding only the managing partners. 7. Profits of the partnership shall be applied as provided in the Partnership Agreement of December 1, 1966. Again, the Amended Partnership Agreement makes no mention of Harry or Lazarus as partners nor does it provide that Ben or McTernan are contributing partners. *546 In two letters written to Ben, however, dated July 29, 1970 and November 2, 1970, respectively, Harry points out the need for more funds from "the group" to carry the Ventura Property. The November letter states that Ben's share would be $16,205.40. The pertinent text of these letters provide as follows: July 29, 1970. Dear Ben: I am responding to your July 1st letter with reference to Ventura Properties.I apologize for the delay and acknowledge in advance that my views require discussion. The Lazarus investment is $15,000.00 of the total $250,000.00 As you are aware, all additional funds have been borrowed and the borrowings now total $250,000.00 almost exactly. The time has come when the group must face up to the fact that additional funds will be required. The meeting of which you have spoken is certainly urgent. There certainly was a time when some additional share for you and John and Lazarus and me may have been justified. With the lapse of time and circumstances, I am extremely reluctant to have any situation develop other than one in which we get interest for the extra period our money was up with the profits then being shared in proportion to the investment. *547 I believe it might be entirely proper for Lazarus and your office to collect some fees for work performed. This would certainly be acknowledged by everyone to be fair. I do not believe it would be proper for me to collect any fees because I will have profited from tax savings and I gambled on the possibility of a large profit which would have given me a large fee for a large tax saving. I do not know if you will agree but this is my present position. There is no question that there should be a written agreement and I intend to redraft one consistent with all of the activity to date. This should be available for signature at the time of our meeting. Lazarus wishes and is entitled to have his share identified. I would therefore suggest a letter from ABC to him stating affirmatively that his $50,000.00 trust share represented 20% of the total property. I believe this is the safest way under all of the circumstances. Please consider the matter and let me have your recommendations and I will act on them properly. If we are in sharp disagreement, I suggest that we at least discuss it over the phone. November 2, 1970. Dear Ben: The Ventura Properties Partnership meeting *548 was held on Friday, October 16th. It was decided to carefully examine the situation and to attempt to come up with some program of a more aggressive character for the property. Mr. Marvin Homer has been employed for that purpose and we should have further information available shortly. It was recognized that each participant would be required to contribute his share of the $150,000 required January 1st. Your share is $16,205.40. Currently monthly payments and the outstanding balance due Anglo Dutch Capital Company of approximately $250,000.00 indicate that an additional $30,240.00 will be required to bring you current overall. Your check to "Harry Margolis, Trustee" is the correct approach so that flexibility will remain for individual tax purposes for the year 1970. Decisions in this area will be made on an individual basis. * * * Some three weeks prior to the July 29, 1970 letter, Ben sent a letter to Harry dated July 1, 1970, with a proposed response, to an inquiry by Lazarus for a copy of an agreement relating to the Ventura Property. This letter provided that a limited partnership was never consumated but a copy of a proposed agreement would be enclosed. In this *549 letter Ben told Lazarus that he is both a general partner and a limited partner. A final draft of this letter was sent to Lazarus on July 24, 1970. The pertinent part of this letter provided as follows: So far as the Ventura agreement is concerned, I am enclosing herewith a copy of a proposed Limited Partnership Agreement which was never actually consummated but which sets forth the understanding between ourselves and the limited partners as to the handling of profits and losses. You, of course, hold a dual position in this regard. You are both a general partner and, insofar as you have invested money in the project, a limited partner.I think that the agreement otherwise fully sets forth our understanding. I am writing this letter on behalf of Harry Margolis and John T. McTernan as well as myself and am authorized to act on their behalf. If there are any questions, please call me and we shall arrange to get together. If you agree that the foregoing accurately sets forth our understanding, please sign the enclosed copy of this letter and return it to me for our files. This letter will be your copy of that understanding. A series of reports titled "Ventura Properties Partnership *550 Investors Report[s]" (hereinafter referred in the aggregate as "Investors Reports" and in the singular as "Investors Report") dated August 31, 1970, October 31, 1971 and March 31, 1973, respectively, we prepared in Harry's law office. Each page of the Investors Reports contains the heading "Ventura Properties Partnership". These Investors Reports contain a balance sheet, profit and loss statement, a loss distribution statement and a growth in equity and outstanding loan balances statement. The 1971 and 1973 reports also contained an investment cost analysis statement. The Investors Reports list the following persons as investors in the Partnership: Ben Margolis John McTernan Simon Lazarus Harry Cohen Harry Margolis Elaine Fischel Albert Aronow Milton Rosenthal Michael Gurdin Eugene Carlin Horst Weinberg Clayton Brock All persons listed on the Investors Reports were the remaining partners listed on the Amended Partnership Agreement, with the exception of John Ford and Isaac Jones, Administrator of the Estate of Inger Stevens, Deceased. In addition, the Investors Reports include Harry, M. Rosenthal (an original partner who had died in 1970) and Albert *551 Aronow (who under the Termination Agreement had allegedly sold his interest). Further the Trust Investors were listed. All persons listed in the Investors Reports had foreign trusts, the trustee for which was ABC. All of the Investors Reports were marked confidential. All persons or their reporesentatives listed on the Investors Reports were mailed copies of the reports. The 1971 and 1973 Investors Reports contained two separate profit and loss statements each. One profit and loss statement is denoted "Per Tax Returns" and the second is denoted "For Investors Only". The profit and loss statements contained in each investors Report is as follows: VENTURA PROPERTIES PARTNERSHIP PROFIT AND LOSS STATEMENT (For Investors Only) November 1, 1966 to October 31, 1971 1966
1967
1968
INCOME
Rental Income
$860 $2,870 $3,210 TOTAL INCOME
860 2,870 3,210 EXPENSES
1st T.D. Interest
1,685 9,788 8,956 2nd T.D. Interest
813 4,448 3,657 3rd T.D. Interest
16,751 ADC Interest
Legal and Accounting
100 270 Property Taxes
1,987 3,984 4,195 Bank Charges
8 Miscellaneous
TOTAL EXPENSES
4,485 18,320 33,837 TOTAL LOSS
($3,625)
($15,450)
($30,627)
*552 1969
1970
1971
TOTAL
INCOME
Rental Income
$2,330 $2,740 $2,800 $14,810 TOTAL INCOME
2,330 2,740 2,800 14,810 EXPENSES
1st T.D. Interest
8,318 7,632 6,352 42,731 2nd T.D. Interest
2,783 1,818 732 14,251 3r T.D. Interest
8,550 8,550 33,851 ADC Interest
576 576 Legal and Accounting
500 2,235 1,599 4,704 Property Taxes
6,759 13,678 11,253 41,856 Bank Charges
1 15 24 Miscellaneous
123 269 198 590 TOTAL EXPENSES
18,484 34,182 29,275 138,583 TOTAL LOSS
($16,154)
($31,442)
($26,475)
($123,773)
VENTURA PROPERTIES PARTNERSHIP PROFIT AND LOSS STATEMENT (For Investors Only) November 1, 1966 to December 31, 1973 1966
1967
1968
1969
INCOME
Rental Income
$860 $2,870 $3,210 $2,330 TOTAL INCOME
860 2,870 3,210 2,330 LOSS ON SALE OF LAND
EXPENSES
Cost of Sales
1st T.D. Interest
1,685 9,788 8,956 8,318 2nd T.D. Interest
813 4,448 3,657 2,783 3rd T.D. Interest
16,751 Legal and Accounting
100 270 500 Property Taxes
1,987 3,984 4,195 6,759 Bank Charges
8 1 Miscellaneous
123 TOTAL EXPENSES
4,485 18,320 33,837 18,484 ($3,625)
($15,450)
($30,627)
($16,154)
*553 1970
1971
1972
1973
TOTAL
INCOME
Rental Income
$2,740 $3,200 $3,250 $1,600 $20,060 TOTAL INCOME
2,740 3,200 3,250 1,600 20,060 LOSS ON SALE OF LAND
10,000 10,000 EXPENSES
Cost of Sales
47,518 47,518 1st T.D. Interest
7,632 6,898 6,282 3,619 53,178 2nd T.D. Interest
1,818 751 28 14,298 3rd T.D. Interest
8,550 8,550 33,851 Legal and Accounting
2,235 1,799 1,530 3,740 10,174 Property Taxes
13,678 11,253 24,753 26,958 93,567 Bank Charges
17 4 7 37 Miscellaneous
269 199 142 12 745 TOTAL EXPENSES
34,182 29,467 32,739 91,854 263,368 ($31,442)
($26,267)
($29,489)
($90,254)
($243,308)
VENTURA PROPERTIES PARTNERSHIP PROFIT AND LOSS STATEMENT (Per Tax Returns) November 1, 1966 to October 31, 1971 1966
1967
1968
INCOME
Rental Income
$860 $2,870 $3,210 Rental Guarantee
7,190 6,790 TOTAL INCOME
860 10,060 10,000 EXPENSES
1st T.D. Interest
2nd T.D. Interest
3rd T.D. Interest
ADC Interest
Legal & Accounting
100 270 Property Taxes
662 3,984 4,195 Bank Charges
Miscellaneous
2 W.M. Interest
195,000 17,190 100,790 R & M - Sign
TOTAL EXPENSES
195,662 21,274 105,257 NET PROFIT (LOSS)
(194,802)
(11,214)
(95,257)
*554 1969
1970
1971
TOTAL
INCOME
Rental Income
$2,330 $2,740 2,800 $14,810 Rental Guarantee
17,670 31,650 TOTAL INCOME
20,000 2,740 2,800 46,460 EXPENSES
1st T.D. Interest
7,632 6,353 13,985 2nd T.D. Interest
1,818 732 2,550 3rd T.D. Interest
8,550 8,500 17,100 ADC Interest
576 576 Legal & Accounting
500 2,235 1,599 4,704 Property Taxes
6,759 13,678 11,253 40,531 Bank Charges
15 15 Miscellaneous
1 35 197 235 W.M. Interest
217,670 530,650 R & M - Sign
234 234 TOTAL EXPENSES
224,930 34,182 29,275
610,580 NET PROFIT (LOSS)
(204,930)
(31,442)
(26,475)
(564,120)
VENTURA PROPERTIES PARTNERSHIP
PROFIT AND LOSS STATEMENT (Per Tax Returns) November 1, 1966 to December 31, 1973. 1966
1967
1968
1969
INCOME
Rental Income
860 2,870 3,210  2,330 Rental Guarantee
7,190 6,790  17,670 Interest Income
TOTAL INCOME
860 10,060
10,000  20,000 EXPENSES
1st T.D. Interest
2nd T.D. Interest
3rd T.D. Interest
PPP Interest
ADC Interest
Legal & Accounting
100
270  500 Property Taxes
662 3,984
4,195  6,759 Miscellaneous
2  1 W.M. Interest
195,000 17,190
100,790  217,670 R. & M. Sign
TOTAL EXPENSES
195,662 21,274
105,257 224,930 NET (LOSS)
($194,802)
$ (11,214)
($95,257)
(204,930)
*555 1970
1971
1972
1973
TOTAL
INCOME
Rental Income
2,740 3,200 15,210 Rental Guarantee
31,650 Interest Income
12,915 12,915 TOTAL INCOME
2,740 3,200 12,915 59,775 EXPENSES
1st T.D. Interest
7,632 6,898 14,530 2nd T.D. Interest
1,818 751 2,569 3rd T.D. Interest
8,550 8,550 17,100 PPP Interest
22.000 22,000 ADC Interest
31,346 12,095  43,441 Legal & Accounting
2,235 1,799 1,530 740  7,174 Property Taxes
13,678 11,253 12,737 53,268 Miscellaneous
35 216 142 16  412 W.M. Interest
530,650 R. & M. Sign
234 234 TOTAL EXPENSES
34,182 82,813 14,409 12,851  691,378 NET (LOSS)
($31,442)
($79,613)
($1,494)
($12,851)
($631,603)
Both profit and loss statements denoted "Per Tax Returns" reflect the interest payments to World Minerals in a total amount of $530,650. Both profit and loss statements denoted "For Investors Only", however, do not reflect any payments to World Minerals. Further, the investment cost analysis reports contained in both reports *556 reflect the principal and interest payments on the obligations of the Partnership but again they do not reflect any payments to World Minerals. The statements appear as follows: VENTURA PROPERTIES PARTNERSHIP INVESTMENT COST ANALYSIS November 1, 1966 and October 31, 1971 COSTS INCURRED
Down Payment on Property
$156,575.76
1st T.D. Payments (Prin.)
47,637.04
(Int.)
42,731.19
90,368.23
2nd T.D. Payments (Prin.)
46,753.38
(Int.)
14,250.62
61,004.00
3rd T.D. Payments (Prin.)
317,500.00
(Int.)
33,851.00
351,351.00
Anglo Dutch Interest Payment
576.00
Property Taxes Paid
41,855.47
Other Operating Expenses Paid
5,318.30
TOTAL COSTS INCURRED
$707,048.76 OUTSTANDING OBLIGATIONS
Accrued Interest Due Anglo-Dutch
24,310.00 Accrued Interest Due PPP
20,166.67
Principal Balance on 1st T.D.
93,597.33
Principal Balance on 2nd T.D.
2,308.99
TOTAL OUTSTANDING OBLIGATIONS
140,382.99 TOTAL INVESTMENT COST AT 10/31/71
847,431.75 REDUCTIONS IN INVESTMENT COST
Original Cash Invested
250,000.00
Rental Income Received on Property
14,810.00
TOTAL REDUCTIONS IN INVESTMENT COST
(264,810.00)
OUTSTANDING INVESTMENT COST AT 10/31/71
$582,621.75 (Due System)
*557 VENTURA PROPERTIES PARTNERSHIP INVESTMENT COST ANALYSIS November 1, 1966 to December 31, 1973 COST INCURRED
Down Payment on Property
$156,575.76
1st T.D. Payments (Prin.)
141,234.37
(Int.)
53,178.00
194,412.37
2nd T.D. Payments (Prin.)
49,062.37
(Int.)
14,298.00
63,360.37
3rd T.D. Payments (Prin.)
317,500.00
(Int.)
33,851.00
351,351.00
Anglo Dutch Interest Payment
43,441.00
Property Taxes Paid
93,567.00
PPP Interest Payment
22,000.00
Other Operating Expenses
10,820.00
Loss on Sale of Land
10,000.00
Cost of Sale on Land
47,518.00
TOTAL INVESTMENT COST AT 12/31/73
836,469.74
REDUCTION IN INVESTMENT COST
Original Cash Invested
250,000.00
Rental Income Received on Property
20,060.00
TOTAL REDUCTIONS IN INVESTMENT COST
(270,060.00)
OUTSTANDING INVESTMENT COST AT 12/31/73
$566,409.74 (Due System)
Most of the payments to and from the Partnership were evidenced by an authorization from used in Harry's office (hereinafter referred to as "Authorization Forms"). These Authorization Forms contain spaces for the date, amount of funds involved, payor, to whom paid, remarks, trust balance and a space *558 marked "payment by". Further, the forms contain three small boxes denoted "circulating," "other" and "out of system". Each of the Authorization Forms which authorized payments from the Partnership to the holders of the deeds of trust on the Ventura Property were marked "out of system" indicating that the funds had left the control of the system. Each of the Authorization Forms which authorized payments to a system entity were marked "circulating" indicating the funds were circulating from one system entity to another and still under the control of the Margolis system. Each Authorization Form was approved by an employee of Harry's or by Harry himself. Authorization Form number 1910, for example, dated 12/26/69 indicates that $200,000 was paid to World Minerals by the Partnership.The Authorization Form was marked "circulating" and it was authorized by Harry. The books and records of the Partnership indicate $200,000 was paid to World Minerals in that year. The primary source of funds for the Partnership in that year consisted of a $110,000 loan from PPP and $100,000 of contributions made by the partners. The $100,000 for contributions was borrowed from Anglo-Dutch. Evidencing *559 the actual money transfer to World Minerals is a bank cable indicating that $200,000 was transferred to World Minerals by the Partnership. The cable indicates that $1,200,000 in total was transferred to World Minerals on January 2, 1970, $200,000 authorized by the Partnership. A second bank cable dated the same date shows that World Minerals transferred $1,275,000 to ALMS, N.V., another system entity. [15] Finally, a third bank cable dated the same date indicates that ALMS, N.V., transferred the $1,275,000 to Anglo-Dutch. [14]
These "money movements" were carefully scrutinized and controlled by Harry's office. Pursuant to the terms of a document titled "Agreement for the Sale of Real Property," effective as of January 1, 1972 but entered into in March of 1972, World Minerals purchased the Ventura Property for $1,590,000 [17] pursuant to its resale guarantee. World Minerals agreed to release the Partnership of the obligation to pay the purchase *560 price and agreed to assume the outstanding obligations due from the Partnership to PPP and Anglo-Dutch in the amounts of $110,000 and $277,586.69, respectively. The Partnership however, agreed to remain liable for the deeds of trust on the Ventura Property originally assumed by El Rio. Pursuant to a document titled "Agreement Dissolving Ventura Properties Partnership/a California General Partnership", with a stated effective date of March 31, 1973, the Partnership was dissolved. Contemporaneous with the execution of this document, and pursuant to a document titled "Assumption Agreement", Anglo-Dutch agreed to assume the obligations of the Partnership. In exchange for its assumption of the Partnership debt, each partner remained liable to Anglo-Dutch for his or her allocable portion of negative capital. The portion of negative capital allocated to each partner is as follows: Allocated Portion of
Name of Partner
Negative Capital
Ben Margolis
John T. McTernan
Harry J. Cohen
$19,350.26
Elaine B. Fischel
20,325.13
Michael Gurdin, M.D.
3,600.14
Eugene Carlin, M.D.
3,600.14
Iassac L. Jones,
28,905.63
Administrator of the Estate
of Inger Stevens,
Deceased.
John Ford, M.D.
40,793.52
Clayton E. Brock, M.D.
24,940.51
Horst D. Weinberg, M.D.
19,257.63
*561 The Partnership filed its final Federal income tax return in 1973. On August 24, 1973, the Ventura Property was sold to Encino Financial Center Ltd. for $690,000. Encino Financial Center Ltd. was a partnership composed of Larry Worchell and the original sellers of the Ventura Property, Marvin Wilson and Samuel Gilbert.The cash proceeds from the sale, in the amount of $566,411.50, was distributed in a check payable to McTernan.The check was then deposited to the account of Anglo-Dutch. The record indicates that the negative account balances of the partners assumed by Anglo-Dutch were paid off by the proceeds of the sale. (Interest deductions)
Antiqua Banking Limited (hereinafter referred to as "Antigua") was an Antigua corporation which came into existence sometime in 1970. Its chief officer and director is Harry and its other officers and directors are Harry's wife and daughters. It was owned by an Hebrides corporation which in turn was owned by a Hong Kong corporation. For all practical purposes, Antiqua replaced Anglo-Dutch as the lending entity in the later 70's for Harry's clients and associates. It was controlled by Harry and its loans were made almost exclusively *562 to Harry's clients and associates. Antiqua was a system entity. Associated Convalescent Enterprises (hereinafter referred to as "Associated Convalescent") was a California corporation engaged in the lending of money primarily to convalescent hospitals owned or operated by system entities. Associated Convalescent was 100 percent owned by Mary El Corporation, a California corporation, controlled by Harry. Mary El Corporation sold the stock of Associated Convalescent to ABC sometime around 1970. Associated Convalescent was liquidated into ABC sometime around 1976 or 1977. Associated Convalescent was a system entity effectively controlled by Harry. On December 29, 1970 petitioner Cohen borrowed $5,000 from Anglo-Dutch. On December 30, 1970 Cohen paid Anglo-Dutch $6,798.50 as interest. [18] This interest amount due was generated from borrowing to make capital contributions to the Partnership. On December 29, 1972 Cohen borrowed $10,000 from Associate Convalescent. On December 29, 1972 Cohen paid Anglo-Dutch *563 $10,209 as interest. On December 29, 1973, Cohen borrowed $70,000 from Antiqua. On December 27, 1973 Cohen received $51,466 as a claimed annuity refund. On December 26, 1973 Cohen paid Anglo-Dutch $119,663 of which amount $18,527 was credited as interest. In 1975 Cohen received a $21,000 loan from Antiqua and on December 10, 1975 he paid $12,637.50 ($3,637 was credited to interest) to Associated Convalescent which it is claimed paid his loan off in full. On December 10, 1975 Cohen paid $7,000 as interest to Antiqua. All loans were processed through Harry's office. OPINION The Trust Investors purchased the Ventura Property for $700,000 in 1966. Some eight months later the Ventura Property was purportedly sold to the Partnership for $1,500,000. Petitioners claim Greater West originally owned equitable title to Ventura Property and El Rio owned legal title. Upon the purchase of the Ventura Property, the Partnership received equitable title from Greater West and El Rio retained legal title. Petitioners assert Greater West was then liquidated into ABC. ABC then sold its notes receivable, including the note receivable from the Partnership, to World Minerals. The Sale Agreement *564 between the Trust Investors and the Partnership required no down payment or principal payments until October of 1972; under the Sale Agreement, however, the Partnership was required to make payment of $400,000 of prepaid interest in order to reduce the interest rate charge. The Partnership suffered large losses in the years 1966 through 1972 as a result of claimed interest payments made primarily to World Minerals and other system entities. On their Federal income tax returns for 1966 through 1972, petitioners reported their distributive share of those losses from the Partnership. Respondent disallowed the deduction of these losses on the ground that the petitioners have failed to show that the sale transaction should be recognized for tax purposes. In his post-trial briefs, respondent contends that the petitioners have not established the form whereby the Partnership allegedly acquired the Ventura Property and in the alternative, the purported sale was a sham devoid of economic substance. Repondent, therefore, concludes that the Partnership never acquired an interest in the Ventura Property which would entitle the individual petitioners to a distributive share of losses. After *565 reviewing the entire record, we are satisfied that the respondent is correct. We have concluded that the purported sale transaction between the Trust Investors and the Partnership was in substance devoid of economic viability and, therefore, was a sham for tax purposes. The principal issue in this case requires us to determine whether the substance of this transaction comports with its form; in form the Partnership acquired the Ventura Property. The whole record indicates, however, that in substance the Trust Investors retained the property and the Partnership acquired nothing except some fictitious debts with interest charges. The substance-form principle has been variously stated. As this Court said in , affd. , cert. denied : It has repeatedly been held that the substance of a transaction rather than the form in which it is cast is determinative of tax consequences unless it appears from an examination of the statute and its purpose that form was intended to govern. The following represent merely a random selection from a wide variety *566 of such cases that are too numerous for comprehensive listing: ; ; ; ; ; ; (C.A. 3), affirming and ; . * * * Recently, we defined a "'sham in substance' as the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits." . See also , affg. , wherein it was stated that although a "taxpayer may structure a transaction so that it satisfies the formal requirements of the Internal Revenue Code, *567 the Commissioner may deny legal effect to a transaction if its sole purpose is to evade taxation." It is incumbent upon us, therefore, in the context of a sale transaction, to determine whether the parties have in fact done what the form of their arrangement purports to do. . In other words, we must determine whether the Trust Investors in substance sold the Ventura Property to the Partnership or whether documents were drafted to characterize the transaction as a sale with no economic significance other than the expected tax benefits. See . For Federal income tax purposes the term "sale" is generally defined as a transfer of property for money or a promise to pay money. . In deciding whether a particular transaction constitutes a sale, the question of whether the benefits and burdens of ownership have passed from seller to buyer must be answered. This is a question of fact which must be ascertained from the intention of the parties as evidenced by the written agreements *568 read in light of the attendant facts and circumstances. , affd. . Various factors which have been considered by courts in making a determination as to whether a sale occurs were summarized in , as follows: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. [; citations omitted.] An additional factor is the presence or absence of arm's-length dealing. , citing , *569 affd. . See also, . With these factors in mind and cognizant of the fact that the totality of the facts and circumstances surrounding the transaction is controlling, we conclude that a sale between the Trust Investors and the Partnership never took place and therefore the Partnership never acquired an interest in the Ventura Property. We recognize, however, that merely because the transaction does not constitute a sale it does not necessarily follow, pro facto, that the transaction is a sham. , citing ; see (purposed sales were not sales but options). We have concluded, however, that the present transaction was entered into without any economic purpose other than the expected tax benefits and, in fact, documents were drafted to characterize the transaction as a sale in anticipation of receiving the favorable tax consequences flowing from the form thereof. At no time did legal title ever *570 vest in the Partnership. Legal title vested in El Rio, a system entity controlled by Harry and the chain of title shows the property going from El Rio to Encino Financial Ltd. in 1973 upon the property's final sale. At trial and in their briefs, petitioners have argued that the Partnership received equitable title when it purchased the Ventura Property pursuant to a land sale contract. Petitioners argue that a land sale contract is a proper mechanism for transferring equitable title to property; equitable title was claimed to have been received from Greater West. Petitioners assert that when the Trust Investors originally purchased the property, El Rio received legal title and Greater West received equitable title to the Ventura Property. The sale documents relating to the original sale of the Ventura Property to the Trust Investors made no mention whatsoever of equitable title vesting in Greater West. Van Walsum, an officer of ABC, the parent company of both El Rio and Greater West, when questioned about why ABC, the entity which acted as trustee for the trusts, did not take legal title, stated "[i]ts [sic] pretty difficult from Curaco for ABC to obtain title and title insurance *571 * * * so we used subsidiaries in the States and Greater West was one of the subsidiaries of ABC for that purpose." Van Walsum was asked "[w]as Greater West to have a financial interest in the property?" and he answered "no, just to obtain the title." When questioned about why legal title was not taken by Greater West, van Walsum stated "Greater West, at that time, was involved in a joint venture where there was a chance of bankruptcy, so we thought it better to put the title in El Rio." Finally, in a 1966 memorandum to Ben, Harry provided "[t]he entire transaction will be handled through El Rio Development Company." General experience tells us that property is normally acquired by the trustee of a trust on behalf of the trust. It is understandable that a foreign trust would use a United States subsidiary to acquire legal title to property. Common sense dictates, however, that two United States subsidiaries are not needed to acquire separate legal and equitable title. Van Walsum explained why title was taken in El Rio and stated that Greater West was to have no financial interest. We are convinced the argument by petitioners that Greater West was the equitable owner of the *572 Ventura Property is pure afterthought. Since Greater West never owned equitable title, the Partnership could never have received equitable title to the Ventura Property. In final analysis, however, it is unnecessary that we accept or reject this assertion because we find the entire transaction to be a "sham in substance." See . To start with, we find the sales price to the Partnership was drastically inflated and negotiations as to that price were not conducted at arm's length. The stated purchase price of $1,500,000 grossly exceeded the then fair market value of the Ventura Property of $700,000. Harry represented the Trust Investors, in which he was a participant, as well as the Partnership, contemporaneously. No appraisal of the Ventura Property was made at the time and Harry unilaterally set the purchase price himself. As we stated in :
Since a normal attribute of a true arm's-length sale is a purchase price at least approximately equal to fair market value, the totally disproportionate purchase price in this instance strongly militates *573 against petitioner's contention that a true sale has taken place. [; citations omitted.] Additionally, petitioner's contention that a sale took place between the Trust Investors and the Partnership is rendered suspect by the fact that the parties, especially the Trust Investors, have treated the transaction inconsistently with the claim that the Partnership actually purchased the Ventura Property. The record indicates that between the time when the Trust Investors sold the property to the Partnership and until the time the Ventura Property was sold to Encino Financial, Ltd., the Trust Investors continued to control the Ventura Property. Lazarus, who was never a partner in the Partnership, and who had originally acted as agent for the Trust Investors in collecting rents and paying bills in 1966, continued in this capacity until 1968, over one year after the Partnership allegedly purchased the Ventura Property. During this time no Partnership books and records existed, only handwritten notes prepared by Lazarus. During this period, if El Rio's bank account lacked the funds to pay an obligation, Lazarus would contact Harry who would advance necessary *574 funds. After 1968, all funds necessary to pay expenses were generally received through loans to the Partnership through Anglo-Dutch and other system entities controlled by Harry. These loans were processed in Harry's office and signed by employees of Harry, or Harry himself, on behalf of the Partnership, even though they had no signing authority. In 1970 and through 1973, Harry's law office distributed Investors Reports which indicated the profit and loss of the Partnership. All the Trust Investors were listed on these reports as "investors in the Partnership", yet, according to the Partnership Agreement they were not partners. These Investor Reports had two profit and loss statements, one titled "Per Tax Return" and one titled "For Investors Only." The profit and loss statement titled "For Investors Only" makes no mention of payments to World Minerals, nor do the other statements recognize amounts paid to World Minerals. The only document which recognizes the payments to World Minerals is the statement titled "Per Tax Return." These reports were prepared and disseminated a full four years after the Partnership purportedly purchased the Ventura Property. Finally, in two letters *575 written in 1970 by Harry to Ben, Harry points out the need for more funds for the Ventura Property. He continues to explain that Ben's estimated share of these funds would be some $16,000; yet Ben was not a contributing partner in the Partnership and if he owed any money it could only be as a Trust Investor. Of further significance with respect to the treatment of the sale transaction by the parties is the obvious disregard of business reality. First, the parties never signed a note for the amount representing the purchase price of the Ventura Property. Second, the parties disregarded the terms of the supposed Sale Agreement. The Sale Agreement calls for 10-percent interest accrued per annum on the $1,500,000 purchase price due and payable October 31, 1972. The rate would drop to 4-1/2 percent per annum if all interest for the six-year period was paid in full by December 31, 1968 provided at least $200,000 of the interest were paid by December 31, 1966.The interest rate would be 5-3/4 percent per annum if all the interest for the entire six-year period was paid in full on or before December 31, 1969 provided at least $200,000 was paid by December 31, 1966 and an additional $200,000 *576 was paid by December 31, 1968. Simple mathematics tells us that at the 10 percent rate approximately $900,000 of interest would be due. At the 5-3/4-percent rate about $500,000 would be due. At the 4-1/2-percent rate somewhere in the neighborhood of $400,000 would be due. The record reflects $195,000 was paid in 1966, $17,190 in 1967, $100,790 in 1968 and $217,670 in 1969 for a total of $530,560. The record indicates that the Partnership acted as if they had met the terms of the Sale Agreement with respect to the 5-3/4-percent rate.The terms of the agreement clearly indicate that $400,000 had to be paid by 1968; otherwise, the agreement calls for the 10-percent figure requiring payment in the neighborhood of $900,000. The Sale Agreement is clear and unambiguous yet the parties disregarded the payment deadlines. Finally, the record shows that most of the documents relating to this transaction were back dated. The Partnership agreement provides it is "entered into and effective this 1st day of December, 1966" but the agreement was not actually signed until sometime in 1971. One of the many inconsistencies in this transaction involves the claim by Harry that the Partnership *577 was clearly intended and was in fact a general partnership. The Partnership Agreement, however, contains language normally included in limited partnership agreements. The Amended Partnership Agreement states in its prefatory language that the Partnership was formed as a limited partnership. Yet a letter sent to Lazarus by Ben advises him that he was both a limited and a general partner in the Partnership when he was neither. Of final significance to the finding that this transaction was a sham, is the presence of a circular money movement used to create the appearance of a payment of interest to World Minerals. The record indicates at least one circular money movement occurred. On December 26, 1969 Harry approved the issuance of a $200,000 check, number 177, to World Minerals. The authorization was evidenced by an Authorization Form, number 1910, commonly used by Harry's office. The Authorization Form was marked "circulating" indicating that funds used to pay the amount would circulate to another system entity controlled by Harry and would be available for further use by the system. At the time the authorization occurred, the Partnership's checking account had a negative balance *578 of $47,752.69. In order to create the illusion of an actual payment of money, a money movement was instituted on January 2, 1970. Pursuant to a cable transfer document, dated January 2, 1970, $1,200,000 was transferred to the account of World Minerals. The cable transfer document indicated $200,000 of this amount was by order of the Partnership. On the same date and also evidenced by a cable transfer document, World Minerals transferred $1,275,000 to the account of ALMS, N.V., another system entity controlled by Harry. Finally, on the same date and again evidenced by a cable transfer document, ALMS, N.V. transferred $1,275,034.25 to the account of Anglo-Dutch. The majority of the funds received by the Partnership was from Anglo-Dutch and a clear inference can be drawn that a circular money movement occurred. In , affd. , we stated in regard to a similar circular movement of money: When the transfer of $600,000 from Alms to petitioner is viewed as a part of the entire money movement transaction, it becomes apparent that Alms was not a true lender but was a mere conduit *579 in the circulation of the Union Bank loan proceeds back to petitioner and Union Bank. Putting aside for the moment a discussion of the genuineness of petitioner's payment to World Minerals, we believe that no purpose, from anyone's standpoint, has been shown for the transfer of the $600,000 from World Minerals back to Alms.There is no reason to presume that the World Minerals-Alms transaction was conducted at arm's length since both entities were effectively controlled by Margolis. Cf. . Although the payment from Alms to petitioner was designed to appear to be a loan, its main effect was simply to complete the circuit so that petitioner could repay the Union Bank loan. The November 1970 money movement, which included the "refund" of the stock purchase payment and the "repayment" of the Alms "loan", was merely the same circuit in reverse * * *.[Fn. ref. omitted.] From this record as a whole, we conclude that this entire sale [19] transaction was an elaborate scheme to bail-out of a depressed real estate market and to generate tax deductions for Harry's clients while protecting Harry and his system entities from recognizing *580 any gain. Harry admits on the record that title was taken in El Rio so that further planning could be implemented. Harry, believing that the Ventura Property would eventually turn around and appreciate substantially, never intended to nor ever did release control of the Ventura Property. The real estate market was depressed but he believed if the Trust Investors held onto the property long enough, they could come out of the slump. The Trust Investors needed money to carry the property for an extended period of time. So Harry turned to his clients, who had foreign trusts with ABC, for money held by these trusts. Harry was able to persuade these clients that the property would eventually appreciate. In order to sweeten the pot, Harry created a scheme to generate current deductions. The incentive for this type of planning is found in the fee arrangement Harry had with his clients. Harry received, as a fee, one third of all tax savings generated by his planning. It is clear that this type of fee arrangement caused Harry to be quite creative in his tax planning endeavors. Harry knew Greater West was to be liquidated into ABC. He recognized if some type of debt could be created *581 in the foreign area, all payments real or illusory could escape scrutiny and taxation by the United States. Thus the equitable ownership argument was invented. By claiming equitable title to the Ventura property was in Greater West, Harry recognized equitable title would pass to ABC, a foreign entity upon the liquidation of Greater West into ABC. He invented the equitable argument, then proposed to sell the Ventura Property to a group of so-called investors. Most of the investors had trusts, the trustee for which was ABC. Debt was then created by the sale, Greater West was liquidated into ABC, and then ABC claimed to have sold its notes receivable to World Minerals. World Minerals had been used as a construction entity in earlier days and this would account for the proposed sale of the notes receivable. All payments to World Minerals escaped taxation by the United States, and any such actual payments were difficult to verify because the books and records of World Minerals were maintained outside of the United States. Harry drafted the sale agreement so that a large amount of interest was required to be prepaid so as to generate large current deductions for his clients. He then *582 turned to his system to generate money movements to create payments so deductions for interest could be taken. The circular money movements appear to be characteristic of Harry's tax planning. See By circulating money among his controlled entities, it appears as though an actual payment has taken place; yet, the money never leaves Harry's control. Finally, to give comfort to his clients, Harry drafted an agreement obligating World Minerals to sell the Ventura Property for $1,500,000, the purported purchase price paid by these investors. This transaction is a classic example of that famous saying "that old dog just won't hunt." As we said in , "[i]n sum, considering the totality of the facts and circumstances surrounding the *583 purported sale transactions, we conclude that petitioners engaged in the expedient of drawing up papers to characterize the transactions in question as something contrary to the economic realities thereof, solely to obtain unallowable tax benefits." Thus, we have before us in substance a sham, the expected tax benefits of which must be disregarded. We so hold. Interest Deduction
Petitioners Cohen assert that they are entitled to deduct the interest paid to Anglo-Dutch, Antiqua and Associated Convalescent on loans purportedly established with these corporations under section 163(a). Respondent counters that petitioners are not entitled to the deduction for the interest paid on the loans because there was no real indebtedness. We agree with respondent that the amounts paid are not deductible because such payments were not made on real indebtedness.Petitioners Cohen have failed to carry their burden to prove otherwise. Section 163(a) provides for the deduction of "all interest paid or accrued within the taxable year on indebtedness." "Interest" means compensation paid for the use of borrowed money. ; *584 Deputy v. du . "Indebtedness" has been defined as "an unconditional and legally enforceable obligation for the payment of money." , affg. . Of course, in order to be deductible, interest must be paid on genuine indebtedness ( , indebtedness in substance and not merely in form. Generally, a statutory notice of deficiency carries with it a presumption of correctness that places the burden of proof and the burden of going forward with the evidence on the petitioner. , revd. in part . Petitioners, therefore, have the burden of proving that the interest they paid on the loans was actually interest on indebtedness rather than a subterfuge to create additional tax deductions, as claimed by respondent. See ; Rule 142(a). The record indicates that some of these *585 loans were generated for the purpose of making capital contributions to the Partnership. These loans are inherently suspect and we find these loans are part of the primary transaction here at issue.Having found the purported sale of the Ventura Property to the Partnership was a sham, we conclude that loans which are created in furtherance of the sham are likewise invalid and tainted. With respect to all other loans, petitioners offered no evidence except the fact that they existed in form and were purportedly paid. No evidence was offered as to why these loans existed or that they in substance existed. Many of the loans were created to make interest payments and to pay off existing loans with system entities while creating a new loan with another system entity. When questioned about the loans, Cohen said he did not know anything about these loans and indicated he relied entirely on Harry for these loan transactions. When asked if he ever owed Antiqua in the neighborhood of $104,000, Cohen stated no he never remembered owing so much money. This is a classic case of "client oblivion." [20]
*586 It is clear from the facts that these loans were handled and controlled by Harry. All loaning entities were system entities controlled by Harry. All payments on these so-called loans were made to system entities. Loan after loan was rolled over into another system entity. It is apparent to us that Cohen never used his own money to pay off these debts. All money used to pay off these debts was received from a system entity. Cohen knew nothing about these loans and we conclude the loans lacked economic substance and were used only as a subterfuge to create additional tax deductions. Those interest deductions are, therefore, denied. In all docket Nos. an appropriate order will be issued restoring them to the general docket for trial of the remaining issues in each case.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Morton Chesney and Tillie Chesney, docket No. 8988-72; Harry J. Cohen and Leah Cohen, docket Nos. 3430-72, 7555-72, 4448-74, 5683-76, 5361-77, 6252-78 and 7978-79; John R. Ford and Ida W. Ford, docket No. 7425-77; Michael M. Gurdin and Marlene J. Gurdin, docket Nos. 1658-70, 4673-71, 4653-72, 3851-74, 7202-75 and 6248-77; Isaac L. Jones and Isaac L. Jones, as Administrator of the Estate of Inger Stevens Jones (Deceased), docket No. 5224-72; Harold M. Plant and Jean B. Plant, docket Nos. 4994-71 and 3798-72; and Jack Tenner and Hallie Tenner, docket No. 5079-71.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise noted.↩
3. Most of these docket numbers contain adjustments other than the disallowed deduction of losses from Ventura Properties Partnership. This consolidated case, as it relates to docket numbers 1224-70, 1658-70, 4673-71, 4994-71, 5037-71, 5079-71, 3430-72, 3798-72, 4653-72, 5224-72, 7555-72, 8988-72, 3851-74, 5539-74, 7202-75, 6248-77, and 7425-77, was tried only on the severed issue of whether each petitioner is entitled to his distributive share of the claimed loss of Ventura Properties Partnership for the years in question.↩
4. These issues relate only to the Cohen group of cases at docket numbers 4448-74, 5683-76, 5361-77, 6252-78 and 7978-79.↩
5. It is procedurally proper to plead avoidance or an affirmative defense such as collateral estoppel. Rule 39.↩
6. Close to 200 exhibits were stipulated into the record by the parties. The stipulation in many instances was that "the parties specifically reserve to the Court the question of legal effect in any of the documents or terms used in . . . [the] stipulation for narrative clarity, preserving at all times their respective positions concerning the substance versus the form of the transactions." Therefore, in finding the facts as stipulated we have found the documents as stipulated to be the documents described, but have not by this finding found the substance of the documents to be necessarily the same as the form. Where we consider it necessary to decide with respect to the substance, as compared to the form of a document, we will include such a comment in our findings of fact or will consider the issue in our opinion. The parties also stipulated with respect to many accounting records of various persons and entities only that the documents were records maintained by that person or entity but reserved to the Court the question of whether the records reflected actual substantial transactions. In finding the facts as stipulated, we find only that these records were maintained and, as stated above with respect to stipulated documents, do not find whether these records reflect the substance of the transaction purported to be recorded.↩
7. Parenthetic headings are not findings of fact, they are used only to assist the reader's comprehension of the facts.↩
8. Only petitioners Plant, Chesney and Tenner did not have foreign trusts established by Margolis.↩
9. See n. 8.↩
10. Petitioners in this case claim that Greater West became equitable owner of the Ventura Properties and that El Rio held only legal title. For reasons discussed in our opinion we refuse to accept this contention.↩
11. The date the Partnership Agreement was signed by or on behalf of each of the persons denominated as a partner is unclear from the record. The agreement provides that it is "entered into and effective this 1st day of December, 1966." Nevertheless, other exhibits entered into evidence indicate the Partnership Agreement was not actually signed until sometime in 1971. A letter from Harry to Ben dated Dec. 30, 1966, reminds Ben of the necessity of executing a formal agreement and also provides proposed percentage terms of the Partnership. That letter provides in pertinent part as follows: Dear Ben: This is by way of reminder that we should do a fairly formal agreement for all of the parties in the Ventura property. My notes indicate the following. 1. All money advanced by all parties regardless of what it is called or how used, is to be returned first plus 6% interest from the time the money has been put up. 2. If there is no development of the property and it is simply sold, then 25% of the profit will go to you, John, Lazarus and me in proportion to our shares invested with perhaps some adjustment on time spent by each of us. Any balance of profit would be divided among all of the parties in porportion [sic] to their investment. 3. Given development, the amount paid for services would be 50% of profits shared among you, John, Lazarus and me in some fair porportion [sic] with the balance going to everyone on the basis of investment.↩
12. See n. 10.↩
13. As noted earlier, Greater West was liquidated in 1966 and its stock was distributed to ABC, its sole shareholder. Having acquired the stock of Greater West, ABC acquired Greater West's notes receivable from the Partnership. Petitioners assert ABC sold the Partnership's notes receivable to World Minerals. World Minerals then owned the Partnership's notes receivable. ↩
14. The $1,500,000 purchase price was purportedly reduced by amounts paid by the Partnership on the deeds of trust assumed by El Rio.↩
15. This bank cable is further clarified by a letter from World Minerals to the bank involved in the fund transfer. ↩
14. This bank cable is also further clarified by a letter from World Minerals to the bank involved in the fund transfer.↩
17. The original purchase price was $1,500,000 but it was increased by a section 754 election made in 1969 due allegedly to the buyout of certain partners in 1969.↩
18. We characterize this payment and other payments in this statement of facts as interest paid in form. We do not characterize these payments as interest paid in substance.↩
19. Whatever the original planning was, it was thwarted by a badly depressed real estate market in southern California in the taxable years together with a tight money market and high interest rates. These tested Harry's ingenuity until he evolved the sale at high price, the equitable title argument and the resale guarantee of World Minerals.↩
20. See Goldberg v. United States,↩ an unreported case ( C.D. Cal. 1984, 85-1 USTC par. 9252, ).